**COMMUNITY ACTION OF LARAMIE COUNTY, INC., a Wyoming corporation, Petitioner–Appellee,**

v.

**Otis R. BOWEN, M.D., Secretary of the United States Department of Health and Human Services, Respondent–Appellant.**

No. 87–1075.

United States Court of Appeals, Tenth Circuit.

Jan. 24, 1989.

---

Rodger McDaniel of Southeast Wyoming Law Offices, Cheyenne, Wyo., for petitioner-appellee.

Peter R. Maier, Civil Div. Appellate Staff Counsel (Richard K. Willard, Asst. Atty. Gen., John F. Cordes, Atty., Dept. of Justice, Washington, D.C., Richard A. Stacy, U.S. Atty., Cheyenne, Wyo., with him on the brief), Dept. of Justice, Washington, D.C., for respondent-appellant.

Before SEYMOUR, MOORE and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

### I.

Head Start is a federally funded program designed to deliver "comprehensive health, educational, nutritional, social, and other services to economically disadvantaged children and their families." 42 U.S.C. § 9831(a). As part of the program's statutory scheme, *id.* §§ 9831–52, Congress has directed the Department of Health and Human Services (HHS) to provide financial assistance or annual grants to designated local agencies "for the planning, conduct, administration, and evaluation of a Head Start program focused primarily upon children of low-income families who have not reached the age of compulsory school attendance." *Id.* § 9833. Because parent participation is an important ingredient in the composition of the plan, S.Rep. No. 484, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4847, 4849, Congress has further mandated that in order to be designated as a Head Start agency, a grant applicant must agree to (1) provide for concerned parents' regular involvement in the implementation of the program and (2) establish effective procedures by which the parents may directly participate in decisions influencing the character of the program. 42 U.S.C. § 9837(b). Once designated, each Head Start agency must abide by "standards of organization, management, and administration" to effectuate the objectives of the plan. *Id.* § 9839(a). HHS may decline to fund a previously designated agency upon a finding that the agency has failed to meet established program and fiscal requirements. *Id.* § 9836(c).

Consistent with its duty to prescribe binding guidelines for the successful operation of the Head Start program, *id.* § 9839(c), HHS has promulgated rules and regulations to ensure effective program administration and grant management. 45 C.F.R. §§ 1301–05 (1987). The parent participation policy with which all designated agencies or grantees must comply as a condition to receiving financial assistance is contained in the Head Start Policy Manual. *Id.* § 1304.5–2. Where the grantee chooses to administer the local program rather than delegate the responsibility to a branch agency, the manual requires the establishment of a Head Start Policy Council. *Id.* § 1304 app. B. The policy council must consist of at least 50% parents of children presently enrolled in the grantee's program plus representatives of the community. *Id.* § 1304 app. B, chart A. The manual, among other things, obligates the grantee to consult the policy council and obtain its approval before prescribing personnel policies for the program's employees or terminating the employment of the local Head Start director. *Id.* § 1304 app. B, chart C. Failure to do either may result in termination of the grant. *Id.* § 1303.33(a)

### II.

Petitioner-appellee, Community Action of Laramie County (CALC), is a multipurpose nonprofit corporation based in Cheyenne, Wyoming. CALC is governed by an eighteen member volunteer board of directors which administers various educational, em-

ployment and social projects within the community. Rec. vol. II at 945. To assist in the administration of the various projects, CALC employs an executive director to oversee its entire operation, as well as directors to manage each of its respective programs. *Id.* at 946.

For the past eight years, CALC has been the grantee agency of the Head Start program in Cheyenne, *id.* at 356–57, and has administered the program in cooperation with a policy council. Until Fall 1984, CALC and the policy council apparently had worked well together. *Id.* at 36. This lawsuit has its genesis in problems which arose between CALC and the policy council for the 1984–85 program year. These problems ultimately resulted in CALC's decision to fire the Head Start director without the policy council's input or approval, and HHS' consequent resolve to terminate CALC's grant.

CALC and the policy council had their first disagreement in October 1984 when they could not reach a compromise on a budget for the upcoming year. *Id.* at 147–48. Accordingly, the annual Head Start grant application to the regional office of HHS, which required the approval of CALC and the policy council, became overdue. *Id.* at 147, 149–50. CALC eventually submitted the application without the policy council's endorsement. *Id.* at 150. HHS returned the application and, after providing the two groups with technical assistance or mediation, finally achieved a consensus. *Id.* The relationship between CALC and the policy council, however, remained problematic. The initial budget dispute led to a polarization of the two groups. *Id.* at 475. The policy council members talked about the possibility of "spinning off" and creating their own grantee agency. *Id.* at 479.

About the same time, CALC began to find fault with the Head Start director, Linda Chasson. Although CALC described Chasson as a generally good employee, *id.* at 284, she had sided with the policy council in the budget conflict and allegedly misled CALC in doing so. *Id.* at 696. On November 8, 1984, CALC issued a written repri-

mand to Chasson, *id.* at 695–96, without notifying the policy council. *Id.* at 436, 708–09. The letter cited both budgetary and staff concerns, and concluded: "[T]he Policy Council has been directed by yourself and your staff in a manner that is detrimental to the agency and the poor people." *Id.* at 695–96.

When CALC perceived no change in the situation, it placed Chasson on probation. *Id.* at 707. In a letter dated December 3, 1984, CALC reiterated its grievance: "Your advice and direction to the Policy Council seems to be the source of many of the existing problems. Your unwillingness to work in a positive mode with the Board and the Executive Director are detrimental to the Head Start Program and Community Action as a whole." *Id.* CALC informed the policy council of Chasson's probation a month later. *Id.* at 436–37.

On January 7, 1985, the policy council questioned CALC's executive director, Linda Burt, about the probation and asked to examine CALC's personnel policies. *Id.* at 708–09. Burt agreed to submit the personnel policies for review, but believed any discussion of the situation should take place only in an executive session between CALC and the policy council with Chasson and her attorney present. *Id.* Two weeks later on January 23, the policy council advised CALC that the personnel policies pertaining to the termination of the Head Start director without the policy council's approval contravened federal regulations, 45 C.F.R. § 1304 app. B, chart C. Rec. vol. II at 854; *see generally id.* at 838–46 (CALC's personnel policies for employee discipline and termination). Nevertheless, without consulting the policy council, CALC informed Chasson on March 12, 1985, that she had not successfully completed her probation, and requested her resignation. *Id.* at 714. CALC apprised the policy council of the latest development by letter the same day. *Id.* at 720. Shortly thereafter, the policy council apprised CALC that it considered the personnel actions against Chasson to be in violation of federal law and invalid. *Id.* at 721. Chasson refused to resign.

Unfortunately, the proposed executive session between CALC and the policy council never occurred. Even after the regional office of HHS provided them with "training" in the area of parental involvement, *id.* at 786, the groups remained deadlocked. Citing CALC's failure to consult with it from the beginning, the policy council declined to attend a hearing on Chasson's imminent dismissal. *Id.* at 443–44, 723, 729. CALC asked the regional office if the Head Start director could be terminated without the policy council's approval where the Head Start program is "held hostage by a Program Director and Policy Council." *Id.* at 781. Reminding CALC of its obligation to abide by federal rules and regulations as a condition of the grant, HHS informed CALC that the policy council must approve such action: "There are no exceptions." *Id.* at 783.

After receiving a letter from CALC's attorney in late April seeking approval of Chasson's discharge, *id.* at 731, the policy council ultimately agreed on May 9, 1985, to review her personnel file. *Id.* at 737. On May 10, Chasson released her file to the policy council. *Id.* at 780. That same day, the policy council unanimously disapproved Chasson's discharge based upon the information in the personnel file. *Id.* at 857–58. Although CALC had assembled a separate grievance file containing additional information on Chasson, it was never released to or perused by the policy council. *Id.* at 345–46. Whether the policy council even knew of the grievance file is subject to debate. *Id.* at 657, 670–71, 674. Evidence that CALC did not ask Chasson to release the grievance file, however, is uncontradicted. *Id.* at 423.

Notwithstanding the policy council's disapproval, on May 16, 1985, CALC voted to fire Chasson effective the next day. *Id.* at 735. Chasson immediately complained to the regional HHS office, *id.* at 91, which ordered CALC to reinstate her pending a review of the matter. *Id.* at 802–03. CALC refused. *Id.* at 804–05. On June 12, HHS informed CALC that a review of the relevant documentation and correspondence revealed a violation of 45 C.F.R. § 1304 app. B, chart C, as well as the grant agreement. *Id.* at 806–09. HHS concluded: "[CALC's] action is, therefore, null and void." *Id.* at 806. Officials from the regional office traveled to Cheyenne on June 22 with hopes of resolving the impasse and achieving compliance with the federal regulation, but to no avail: "Both groups are adamant in not changing their positions. [CALC] does not want to reinstate the Headstart [sic] Director and the Policy Council does not approve the firing. The Regional Office will proceed to initiate termination procedures." *Id.* at 810. On August 6, 1985, HHS officially informed CALC of its intent to terminate financial assistance under 45 C.F.R. § 1303.33(a), (b). *Id.* at 684.

## III.

Pursuant to 42 U.S.C. § 9841(3) and 45 C.F.R. § 1303.33(b)(3), CALC requested and received a hearing on the proposed termination. From October 16 through 18, 1985, the administrative law judge (ALJ) heard much conflicting evidence. CALC did not deny transgressing federal regulations, but instead claimed that cessation of its grant was unjustified under the circumstances. CALC painted a picture of an irresponsible Head Start director who exceeded allowable expenditures, rec. vol. II at 106, 579, permitted uninsured individuals to drive the children's bus, *id.* at 343–44, 578, undermined CALC's relationship with its employees, *id.* at 579–80, missed staff meetings, *id.* at 335, took unauthorized absences, *id.* at 293–94, 297, and was uncooperative, *id.* at 314. CALC characterized the policy council as ignoring the problem. *Id.* at 204, 291, 308, 315, 321. In contrast, HHS depicted CALC as an overbearing, fiscally unreliable body, *id.* at 392, 429–30, 538, 790, which considered the policy council as nothing more than an advisory group, *id.* at 789.

Consistent with 45 C.F.R. § 1303.36, the ALJ delivered his "initial decision" in March, 1986. Weighing all the evidence, the ALJ in a thorough, forty-five page opinion, rec. vol. II at 936–81, concluded:

[P]erhaps with a new policy council in office and a replacement head start director qualified and satisfactory to the policy council, continued financial assistance to CALC might be a better course than selection of a new grantee with attendant disruption of head start services to the community. On the other hand, given CALC's past attitude toward the policy council and no assurance of improvement on which HHS can rely, a replacement grantee may be in the best interest of head start services in the community.... On the basis of the evidence at the hearing it is the finding of the presiding officer that termination of financial assistance to CALC for a head start program is warranted and justified.

*Id.* at 979–80.

CALC promptly appealed the ALJ's initial decision to the regional administrator of the Office of Human Development Services within HHS as provided by 45 C.F.R. § 1303.36(c). When the regional administrator agreed with the ALJ, rec. vol. II at 1124–37, CALC sought further review under subsection (e) of § 1303.36 by the commissioner of the HHS' Administration for Children, Youth and Families. Concluding that CALC's violation of the federal regulations was knowing and wilful, the commissioner upheld the termination of the grant. Rec. vol. II at 2–14. Having exhausted its administrative remedies, CALC took a third appeal to the federal district court.

■ In its complaint, CALC alleged that because of the "overall intent and purpose" of the Head Start statutes and regulations, and its duty to "assure that only persons capable of discharging their duties with competence and integrity are employed", 42 U.S.C. § 9839(a)(2), the commissioner's "final decision must be set aside as ... arbitrary, capricious, in excess of the agency's statutory jurisdiction, authority and limitations and an abuse of discretion and otherwise not in accordance with the law and the spirit thereof." Rec. vol. I, doc.

# 1 at 4. The district court concurred and set aside the commissioner's ruling. *Id.* doc. # 12. Respondent-appellant, HHS, appeals. Our power to review this controversy arises under 28 U.S.C. § 1291. Because the district court lacked subject matter jurisdiction, we reverse and remand with directions to dismiss the complaint.[1]

### IV.

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, presumptively entitles "[a] person suffering legal wrong because of agency action ... to judicial review thereof," *id.* § 702, so long as such action is final within the meaning of § 704. "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986). But the presumption of reviewability is not absolute or without exception. The provisions of the APA are applicable "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). In this case, Congress has not expressly prohibited review of HHS' determination. Therefore, it is with the second exception that we concern ourselves.

The exception to judicial review for action "committed to agency discretion by law" is indeed narrow. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The APA's legislative history reveals that subsection (a)(2) applies only where "statutes are drawn in such broad terms that in a given case there is no law to apply." S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945). Although this statement furnishes little assistance to courts attempting to apply subsection (a)(2), the Supreme Court in *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.

---

**1.** A determination of the district court's subject matter jurisdiction is a question of law reviewable *de novo* on appeal. *Walden v. Bartlett*, 840 F.2d 771, 772–73 (10th Cir.1988); *Madsen v.*

*United States ex rel. United States Army, Corps of Engineers*, 841 F.2d 1011, 1012 (10th Cir. 1987).

2d 714 (1985) shed additional light on the exception's meaning:

> [E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in § 706—if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion."

In other words, only if Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion" is there "law to apply" under § 701(a)(2). *Chaney*, 470 U.S. at 834, 105 S.Ct. at 1657. *See Webster v. Doe*, — U.S. —, 108 S.Ct. 2047, 2057, 100 L.Ed.2d 632 (1988) (Scalia, J., dissenting) (exception also encompasses agency action considered "traditionally unreviewable" such as a "sensitive and inherently discretionary judgment call").

### V.

In *Chaney*, the Court differentiated between agency action and inaction, and concluded that under § 701(a)(2) agency refusals to institute investigative or enforcement proceedings were unreviewable in the absence of a contrary congressional intent. *Chaney*, 470 U.S. at 838, 105 S.Ct. at 1659. However, "when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory power." *Id.* at 832, 105 S.Ct. at 1656 (emphasis in original).

■ It is beyond doubt that the district court in this instance possessed jurisdiction to determine whether HHS violated federal statutes in terminating CALC's grant. 42 U.S.C. § 9836(c)(1) clearly states that HHS shall give a previously designated agency priority in funding unless the Secretary finds the agency fails to meet program requirements. Consequently, if CALC did not violate "program requirements" by firing the Head Start director without the policy council's approval, then HHS would have been unable to terminate the grant on this ground. Because a valid "legislative rule" or substantive federal regulation is binding to the same extent as a statute, *National Latino Media Coalition v. Federal Communications Comm'n*, 816 F.2d 785, 788 (D.C.Cir.1987), HHS failure to follow its own regulations likewise may be challenged under the APA. *See Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (failure of agency to follow regulations in discharging employee reviewable); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (federal courts may review agency action to ensure its own regulations have been followed). 45 C.F.R. § 1303.33(a) provides that "[t]he responsible HHS official may terminate financial assistance to a grantee in whole or in part for failure to comply with any requirement ... as stated in § 1303.30." Section 1303.30 states: "This subpart establishes rules and procedures for the suspension and termination of financial assistance under the Act, for failure of the grantee to comply with applicable laws, regulations, guidelines, standards, instructions, assurances, terms and conditions...." Thus, if HHS discontinued financial assistance to CALC without sufficient evidence to conclude that federal statutory or regulatory law had been violated, a federal court might determine the agency's action to be "arbitrary, capricious or an abuse of discretion." *See* 5 U.S.C. § 706 (standards of review for agency action).

■ Similarly, federal courts must be prepared to insure that governmental agencies have not surpassed constitutional boundaries in selecting a course of action. For even where agency action has been "committed to agency discretion by law," judicial review of colorable constitutional

claims remains available unless Congress has made its intent to preclude review crystal clear. This stricter standard serves "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, —— U.S. ——, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988); *see also WWHT, Inc. v. Federal Communications Comm'n*, 656 F.2d 807, 815 n. 15 (D.C.Cir. 1981) ("In no event would a finding of nonreviewability on the ground that an action is committed to agency discretion preclude judicial review when constitutional violations have been alleged.")

■ But CALC does not claim a violation of any constitutional guarantee. Nor does CALC's complaint challenge HHS' conclusion that CALC violated the federal regulation which requires a grantee to obtain the approval of the policy council before discharging the Head Start director. 45 C.F.R. § 1304 app. B, chart C. Rather, CALC asserts that HHS' chosen remedy is unjustified under the circumstances of the case. Because neither Congress nor HHS itself, however, has promulgated substantive guidelines for the agency to follow when deciding whether to terminate a grant or impose a lesser sanction for violation of the rules, there is no law for the court to apply. *See Chaney*, 470 U.S. at 832–33, 105 S.Ct. at 1656. The applicable statutes and regulations are so broadly drawn that the court has no standard against which to measure HHS' exercise of discretion. *See Slyper v. Attorney General*, 827 F.2d 821, 824 (D.C. Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988).

CALC correctly notes that at the outset of the administrative hearing, the ALJ defined the issues to include "whether based on all the evidence and argument, a decision to terminate financial assistance to CALC for the operation of the Head Start Program is warranted and justified under all the circumstances." Rec. vol. II at 58–59. This is consistent with the ALJ's duty under 45 C.F.R. § 1303.36(b):

The decision of the presiding officer *may provide* for termination of financial as-

sistance to the grantee in whole or in part, and *may contain* such terms, conditions, and other provisions as are consistent with and will effectuate the purposes of the Act [emphasis added].

CALC, however, points to no regulation which limits the ALJ's discretion once he determines that a regulation has been broken. Instead, the ALJ, having heard the evidence, "may provide" for termination of the grant. *Id.*

The agency's unlimited discretion in selecting a remedy is further exemplified by § 1303.33(b) of the regulations. Subsection (b) provides that "[i]f the responsible HHS official *believes* that alleged noncompliance with any requirement ... is serious enough to warrant termination of financial assistance ... he will so notify the grantee...." (emphasis added). Like § 1303.36(b), this provision places no boundaries on the HHS official's exercise of discretion. The regulations simply do not limit HHS' response to the problem between CALC and the policy council once the agency has determined that a program violation has indeed occurred.

The Head Start Act, 42 U.S.C. §§ 9831–52, similarly fails to offer CALC support. Relying on its responsibility to "assure that only persons capable of discharging their duties with competence and integrity are employed," *id.* § 9839(a)(2), CALC argues it had no choice but to discharge the Head Start director regardless of the policy council's position; and this is the standard by which HHS' decision must be judged. In reaching its decision, the agency no doubt should consider the grantee's duty to employ an able staff, just as it should consider the grantee's duty "to establish effective procedures by which parents ... concerned will be enabled to directly participate in decisions that influence the character of programs affecting their interests." *Id.* § 9837(b)(1). But these provisions do not set "substantive priorities" for determining when HHS should revoke a grant. *Chaney*, 470 U.S. at 833, 105 S.Ct. at 1656. Congress has given HHS broad authority to operate the Head Start project, including the power to prescribe binding rules for all

grantees. 42 U.S.C. § 9839(c). Before terminating financial assistance for an established violation of the law, Congress requires only that the agency afford "reasonable notice and opportunity for a full and fair hearing." *Id.* § 9841(3). This is exactly what CALC received.

This case is unlike our recent decision in *Sierra Club v. Hodel,* 848 F.2d 1068 (10th Cir.1988). That controversy arose when Garfield County, Utah proposed to improve a roadway which ran between two federally protected wilderness study areas (WSA). The Sierra Club sued the Department of the Interior alleging that the department's failure to expressly approve the construction violated federal law. The department asserted its inaction fell within the 5 U.S.C. § 701(a)(2) exception to judicial review. We disagreed. Because federal law assigned to the defendant the responsibility not only to "define and protect 'roadless' areas of 'more than 5,000 acres' 'having wilderness characteristics'" and "to manage WSAs 'in a manner so as not to impair the suitability of such areas for preservation of wilderness ... [but also] by regulation or otherwise [to] take any action required to prevent unnecessary or undue degradation'" we held there was "'law to apply'" to the defendant's "'enforcement'" decision. *Sierra Club,* 848 F.2d at 1075–76. In contrast, Congress has provided no such guidance to HHS in the area of grant administration.[2]

### Conclusion

Without manageable substantive standards against which to judge HHS' exercise of discretion, our review would amount to nothing more than an impermissible ad hoc assessment of the fairness of agency action. We are not empowered to ask whether HHS' decision was wise in the absence of controlling guidelines. "The federal courts ... were not established to operate the administrative agencies of government." *Kuhl v. Hampton,* 451 F.2d 340, 342 (8th Cir.1971).

Congress could have hardly intended for a federal court to interject itself into the funding decision of an executive agency, especially where such decision is prompted by a controversy which has its roots in a local political dispute between groups both claiming a right to decide the fate of an employee. Funding determinations are "notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." *Alan Guttmacher Inst. v. McPherson,* 597 F.Supp. 1530, 1536–37 (S.D.N.Y.1984) (decision of governmental agency not to renew magazine's funding grant held unreviewable).

In a dispute between two potential Head Start grantees over which should be awarded federal funds, the late Judge Friendly eloquently stated the case for judicial caution in administrative review:

The plaints of federal judges about excessive burdens are likely to fall on rather deaf ears when we needlessly open the door to disputes ... as to which [agency] should get federal funds. Many of our wounds are truly self-inflicted. Apparently we simply cannot bear to forego any opportunity to preserve the imposition of the supposed omniscience of federal judges on what we think to be the ignorance or bias of dedicated and

---

2. The Supreme Court's decision in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) is also readily distinguishable. That case involved the Secretary of Transportation's approval of interstate highway construction through a park. The applicable statute stated the Secretary "'shall not approve any program or project' that requires the use of any public parkland 'unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park.'" *Id.* 401 U.S. at 411, 91 S.Ct. at

821. Concerned citizens challenged the Secretary's approval under the law, arguing its requirements were not satisfied. Rejecting the Secretary's argument that his action was "committed to agency discretion by law,", the Court reasoned: "This language is a plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted." *Id.* Thus, *Overton Park* involved a statute which set clear guidelines within which the Secretary was bound to exercise his discretion.

experienced administrators, no matter how rarely the opportunity may be exercised, how little the value or how great the cost.

*Economic Opportunity Comm'n v. Weinberger,* 524 F.2d 393, 406 (2d Cir.1975) (Friendly, J., concurring).

Accordingly, the judgment of the district court is reversed and this cause remanded with instructions to dismiss the complaint for want of subject matter jurisdiction.

REVERSED and REMANDED.