Phillip J. **HAMMOND**, Plaintiff,

v.

**COMPTROLLER OF the CURRENCY, Administrator of National Banks, Defendant.**

**No. 94–2495–EEO.**

United States District Court, D. Kansas.

March 3, 1995.

See *McKinney v. Anderson*, 924 F.2d 1500, 1510–11 (9th Cir.) *vacated on other grds*, 502 U.S. 903, 112 S.Ct. 291, 116 L.Ed.2d 236 (1991).

William M. Modrcin, Dennis L. Davis, Cheryl Bloethe Linder, Hillix, Brewer, Hoffhaus, Whittaker & Wright, L.L.C., Kansas City, MO, for plaintiff.

Anthony J. Steinmeyer, Jacob M. Lewis, William Bowden, Jr., Washington, DC, for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This is an action to review the decision of the Office of the Comptroller of the Currency ("OCC") disapproving the proposed appointment of petitioner Phillip J. Hammond to the positions of president, chief executive officer, and member of the board of directors of First National Bank of Shawnee Mission ("First National"), in Fairway, Kansas.[1] The OCC based its disapproval on the ground that Hammond lacked the necessary integrity to head First National because it determined that Hammond, while president of another bank, had conditioned the approval of a loan for a bank customer upon that customer's purchase of certain real estate, in violation of 12 U.S.C. § 1972. 12 U.S.C. § 1972(1)(A) prohibits a bank from extending credit "on the condition or requirement that the customer shall obtain some additional credit, property, or service" from the bank.

### I. *Factual Background.*

#### *Statutory Background: Section 914*

Section 914 of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1831i(a), provides that an insured depository institution must provide thirty days advance notice to the "appropriate Federal banking agency" (for national banks, the appropriate agency is the OCC) of the proposed addition of any director to the board, or employment of any individual as senior executive officer, if the depository institution: (1) has been chartered less than two years; (2) has undergone a

---

1. The plaintiff's request for oral argument is denied. The court, in its discretion, concludes that oral argument would not materially assist it in deciding the issues. *See* D.Kan. Rule 206(d).

change in control within the preceding two years; or (3) is not in compliance with the minimum capital requirement applicable to the institution or is otherwise in a "troubled condition." The institution may not hire a senior executive officer or add an individual to its board of directors if the banking agency issues a notice of disapproval prior to the end of the thirty-day period beginning on the date the agency receives notice of the proposed hiring or addition. *See* 12 U.S.C. § 1831i(b). The standard for disapproval is set forth in 12 U.S.C. § 1831i(e):

> The appropriate Federal banking agency shall issue a notice of disapproval with respect to a notice submitted pursuant to subsection (a) if the competence, experience, character, or integrity of the individual with respect to whom such notice is submitted indicates that it would not be in the best interests of the depositors of the depository institution or in the best interests of the public to permit the individual to be employed by, or associated with, the depository institution or depository institution holding company.

### First National's Notice to Appoint Hammond

On March 18, 1993, the board of directors of First National filed with the OCC a notice that they were proposing to hire Hammond as the bank's president, chief executive, and member of the board of directors. Upon receipt of the notice, the OCC sent out inquiries to various state and federal agencies asking if they had any comments on Hammond. In response, the Federal Deposit Insurance Corporation ("FDIC") informed the OCC that it had obtained a sworn statement from Allen B. Sander that "indicate[d] Mr. Hammond was involved in at least one apparent tying arrangement in violation of 12 U.S.C. 1972" while he was employed as president of Country Hill Bank ("Country Hill") of Lenexa, Kansas. The FDIC furnished to the OCC Sander's October 14, 1992, deposition, which described Sander's tying allegations in full.

### The Sander Deposition

According to Sander's deposition, in the spring of 1989 he submitted an application to Country Hill for a loan for his company, Shamrock Service Vending Co. ("Shamrock Vending"), to purchase Mid–America Refresh, Inc. ("Mid–America"), a vending company. Hammond initially informed Sander that the loan had been turned down. A week or two later, however, Hammond contacted Sander again to say that the bank had an office building (located at 465 Parker Street in Olathe, Kansas) that they needed to "take care of, get rid of or get handled," and if Sander was willing to buy the building in a foreclosure sale, the bank "would be interested in making [him] a loan for the vending company." According to Sander, he was told that the purchase price for the office building would be $600,000, and that the bank would be willing to provide 100% financing.

Sander drove by the Parker Street building once before he purchased it, but did not go inside, because he did not have a key. According to Sander, "everybody agreed" that the price for the building "was high ... very high," but he "felt like we were in this 'you scratch my back, I'll scratch yours' situation." There was absolutely no question "whatsoever" in Sander's mind that he had to purchase the Parker Street building in order to obtain the loan to do the Mid–America deal. Sander stated that Hammond also told him that if the loan for the vending company were approved, "the building has to close before you close on your vending company."

Ultimately, Country Hill loaned Sander's company, Shamrock Vending, a total of $1,825,000 in connection with the Mid–America acquisition, $600,000 of which was to purchase the Parker Street property.

For several years, Sander and Shamrock Vending were able to stay current on the loan, despite the losses on the Parker Street property, which Sander estimated at five to six thousand dollars a month. Then, in the spring of 1991, after Hammond had left Country Hill, things got "very tight," and Sander asked whether an $80,000 certificate of deposit Shamrock Vending had pledged for collateral could be released so that he could pay off some of the debts he owed to Country Hill. The bank agreed, but on the condition that Sander sign a general release

of all claims he or Shamrock Vending may have had against Country Hill.

The release of the certificate of deposit eased the pressure on Shamrock Vending for a while, but the mild winter of 1991–1992 hurt vending sales, and Sander began to talk to other banks about refinancing Shamrock Vending's debt. The "stumbling block," as he explained, "was the Parker building." According to Sander:

> Anytime anyone looked at me, you know— the vending company, you know, on paper looks okay. The Parker building here you throw them both together it's not a pretty sight; and it worried the banks and it was declined by two banks; and finally Oak Park Bank said that they could work with me but not on the Parker building, you know, they didn't want to be involved in that.

Sander explained that "[y]ou rehash the story a couple of times to a couple of people, bankers, attorneys, and friends, they say, 'You know, something isn't right here; something is wrong.'" After asking Country Hill several times to take back the building in order to allow him to refinance the vending company loan, Sander retained an attorney.

Sander confronted Phil Forrest, Hammond's successor at the bank, and suggested that the Parker Street transaction was not right and that the bank should take the property back. According to Sander, Forrest "blew up" and stated that the transaction was a "completely legit deal." As Sander told it, Forrest said to him that "[i]f Phil Hammond misrepresented something to you about the transaction or you misunderstood something, that was totally Phil Hammond, nothing to do with the board or anything like that; and if Phil Hammond did misrepresent something to you, we will go after him because we did nothing wrong." Forrest also specifically denied that anything had been tied together. However, after Sander made clear that he was prepared to sue the bank, Country Hill settled. The bank took back the Parker Street building and credited Shamrock Vending $500,000 on its loan with the bank, thereby allowing the company to transfer its loan to Oak Park.

### The OCC's Investigation of Sander's Charges

The OCC initiated an investigation of the charges against Hammond contained in Sander's affidavit. On April 13, 1993, the OCC interviewed Hammond for approximately three hours. At that time, Hammond "could not recall many of the specifics involved in the financing extended to Mr. Sander." As a result, a week later, OCC officials wrote Hammond a six-page letter asking a number of follow-up questions concerning the Sander loan. In response to the interview and the follow-up request, Hammond provided additional information. He continued to maintain, however, that even after reviewing the documents in his possession, he could "not remember," among other things, (1) whether Sander contacted him about the vending company purchase before Hammond asked Sander if he was interested in purchasing the Parker Street property, (2) when Hammond first became aware Sander wanted to make the vending company purchase, and (3) why the loan committee minutes make no reference to the connection between the two loans.

### The Disapproval Decision

After reviewing Hammond's additional responses, and further investigating the facts surrounding the Sander loan, the OCC, on April 29, 1993, issued a nine-page letter informing Hammond that his application to head First National had been disapproved. The OCC informed Hammond that its disapproval was based on the agency's "conclusion that, while serving as president of Country Hill Bank, Lenexa, Kansas, you engaged in a loan transaction with Mr. Allen B. Sander which resulted in a violation by Country Hill Bank of the anti-tying provisions of 12 U.S.C. § 1972." The OCC explained to Hammond: "[y]our participation in this transaction reflects adversely on your character and integrity and warrants the disapproval of your application pursuant to 12 U.S.C. § 1831i(e)."

The OCC's disapproval letter recounted that Sander had testified in his deposition that he "had to purchase" the Parker Street property "in order to obtain the loan he wanted to buy Mid–America," and that Sand-

er stated that "he knew he was paying more than the [Parker Street property] was worth."

The letter also noted that the Parker Street property was originally purchased by Sander at a sheriff's sale on May 22, 1989, for $600,000, which was approximately the amount of the total debt on the property held by Anchor Savings Bank, the holder of a first mortgage on the property, and Country Hill, which held the second mortgage. The May 22 sale was set aside, however, when it was discovered that Anchor had not foreclosed on its first mortgage, and a dispute over the proceeds arose. A second sheriff's sale was held some six weeks later. In the interim, the Parker Street purchase loan was folded into the financing for the Mid–America acquisition, which closed June 9, 1989. The note governing the Mid–America debt provided that $600,000 of the total $1,825,000 was to be used to obtain clear title to the Parker Street property.

The OCC acknowledged in its disapproval letter that Hammond denied he had conditioned the Mid–America loan on Sander purchasing the Parker Street property. The OCC letter also acknowledged Hammond's explanation that he had simply offered the Parker Street property to Sander, although he was "willing to make the deal work by financing the vending company purchase."

The OCC informed Hammond in the letter that "at first glance, this appears to be a case of Sander's word against yours. However, when all the available evidence is analyzed, it weighs in favor of the conclusion that, in fact, you did require Sander to buy the [Parker Street property] in order to obtain the financing to purchase Mid–America." Additionally, the OCC observed, "[y]our failure to recall even the most basic events which occurred when the loan was made raises serious questions about the truthfulness of your statements." The OCC explained that the gaps in Hammond's memory were unlikely, given that: (1) Hammond had signed "every document requiring a bank representative's signature" relating to the loan to Sanders, (2) Hammond had been personally involved in the two sheriff's sales, and the first sale "was certainly not an ordinary transaction" in view

of the controversy about the application of proceeds from the May 22, 1989 sale, the subsequent reversal of the sale and refund of money to Sander (i.e., Country Hill), and the resale of the property six weeks later, and (3) Hammond was the only bank officer involved in the loan.

The OCC enumerated other facts which it stated called into doubt Hammond's version of the loan origination. The OCC stated that if Hammond was correct that the only way the Parker Street loan could have been made was in connection with the Mid–America financing, "it would be logical for both loans to have been approved at the same time by the bank's loan committee." However, Country Hill's loan committee minutes indicate that the committee first approved the Mid–America loan on May 11, 1989, for $1,200,000 with "no reference" to the Parker Street purchase loan.

"Finally," the OCC stated, "the bank's treatment of Sander after you left the bank implies bank management or ownership was concerned about liability to Sander." Otherwise, the letter explained, there would have been no need for Sander to sign a release of liability in order to obtain the proceeds from the certificate of deposit he had pledged for collateral. The OCC also found "the fact that the bank eventually gave Sander a $500,000 credit on this loan is itself a strong indication that Sander's version of the story is true."

Hammond filed an administrative appeal of the OCC's disapproval decision, denying that he had required Sander to buy the Parker Street property in order to obtain the financing to purchase Mid–America.

### The Denial of Hammond's Administrative Appeal

On June 16, 1993, the OCC denied Hammond's appeal. In a letter signed by Deputy Comptroller John R. Powers, the agency stated that:

> The OCC has reviewed the record in this case, including the grounds given for the Disapproval, your appeal, the documentation submitted with your appeal, and other information relevant to the proposed em-

ployment. In accordance with the grounds of your appeal, the OCC has considered whether the reasons given for disapproval are contrary to fact, that such reasons are insufficient to justify disapproval, or both. Upon review of all the information, the OCC denies your appeal and sustains the Disapproval. I find that you have not carried the burden of demonstrating to the OCC that the reasons given for the disapproval are contrary to fact or that such reasons are insufficient to justify the disapproval.

In support of this conclusion, the agency found that:

[Hammond,] while serving as president of Country Hill Bank, Lenexa, Kansas ... required Allen B. Sander to acquire the property located at 465 Parker, Olathe, Kansas ... from the bank as a condition to obtaining financing to purchase Mid–America Refresh, Inc. This action was in violation of the anti-tying provisions of 12 U.S.C. § 1972 and warrants disapproval of your application and denial of your appeal.

Specifically, the OCC explained that "among the principal bases" for its conclusion were (1) "[t]he price paid by Mr. Sander for the Parker Street Property versus the earnings of the property, (2) "the presence of three different notes regarding the loans for the Parker Street Property and Mid–America Refresh, Inc.," and (3) "the circumstances surrounding Country Hill Bank's settlement with Mr. Sander."

On July 12, 1993, Hammond filed a petition for review of the OCC's decision with the Tenth Circuit. The OCC filed a motion to dismiss or transfer the petition, on the ground that there is no provision for direct review of section 914 notices of disapproval in the courts of appeals. The Tenth Circuit thereupon transferred the petition for review to the United States District Court for the District of Kansas, 43 F.3d 1483.

## II. *Discussion.*

### A. Jurisdiction

As a threshold matter, the OCC contends this court lacks jurisdiction to consider Hammond's petition. Specifically, the agency claims that its decision to issue a notice of disapproval pursuant to 12 U.S.C. § 1831i(e) is not subject to judicial review.

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, presumptively entitles a person suffering legal wrong because of agency action to judicial review. 5 U.S.C. § 702 provides, in part:

A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

"[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2136, 90 L.Ed.2d 623 (1986). The presumption of reviewability, however, is not absolute or without exception. Under certain circumstances, judicial review of agency action is precluded. The exceptions to judicial review are set forth in 5 U.S.C. § 701(a). It provides:

This chapter [5 U.S.C. §§ 701 *et seq.*] applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

The OCC urges that its decision to issue a notice of disapproval regarding Hammond in an action "committed to agency discretion by law" under section 702(a)(2).

The APA's legislative history reveals that subsection (a)(2) applies where "statutes are drawn in such broad terms that in a given case there is no law to apply." S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945). The Supreme Court in *Heckler v. Chaney* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), furnished assistance to courts attempting to apply subsection (a)(2) with the following interpretation of the subsection's meaning:

Even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against

which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.

The Supreme Court went on to observe:

The danger that agencies may not carry out their delegated power with sufficient vigor does not necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance. That decision is in the first instance for Congress, and we therefore turn to the [relevant Act] to determine whether in this case Congress has provided us with "law to apply." If it has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is "law to apply" under § 701(a)(2), and courts may require that the agency follow that law; if it has not, then an agency refusal to institute proceedings is a decision "committed to agency discretion by law" within the meaning of that section.

*Id.* at 834–35, 105 S.Ct. at 1657–58. *See also Lincoln v. Vigil,* —— U.S. ——, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).

The Supreme Court again considered the meaning of section 701(a)(2) in *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). There, an employee who had been discharged for security reasons brought suit against the director of the CIA. The court examined the language of section 102(c) of the National Security Act of 1947, which authorized the Director to terminate an employee whenever he "shall deem such termination necessary or advisable in the interests of the United States," and determined that APA § 701(a)(2) precluded judicial review. In reaching this conclusion, the court noted that section 102(c) allowed termination of a CIA employee whenever the Director "*shall deem* such termination necessary or advisable in the interests of the United States" (emphasis added), not simply when the dismissal was necessary or advisable to those interests. Consequently, the court reasoned, the standard "exuded deference" to the Director and appeared to foreclose any meaningful judicial review short of permitting cross-examination of the Director's views of national security—a result the court apparently found infeasible. *Id.* at 600, 108 S.Ct. at 2052.

■ The "commitment to agency discretion" exception is not limited to cases in which there is "no law to apply." "Whether and to what extent a particular statute precludes review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Inst.,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2453, 81 L.Ed.2d 270 (1984). The general presumption favoring judicial review of administrative action is overcome where congressional intent to preclude judicial review is "fairly discernible in the statutory scheme." *Id.* (citing *Data Processing Serv. v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970)).

The OCC first contends that judicial review of its disapproval decision is precluded because the statute that sets forth the standard for disapproval, 12 U.S.C. § 1831i(e), "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *citing Lincoln v. Vigil* and *Heckler v. Chaney,* 12 U.S.C. § 1831i(e) provides:

**Standard for disapproval.** The appropriate Federal banking agency shall issue a notice of disapproval with respect to a notice submitted pursuant to subsection (a) if the competence, experience, character, or integrity of the individual with respect to whom such notice is submitted indicates that it would not be in the best interests of the depositors of the depository institution or in the best interests of the public to permit the individual to be employed by, or associated with, the depository institution or depository institution holding company.

We find that the factors relied upon by the Supreme Court in holding other agency action nonreviewable under section 701(a)(2) are applicable to the instant case. The language of the statute authorizing the OCC to issue a notice of disapproval contemplates a

number of highly discretionary inquiries. The OCC must examine the applicant's "competence," "experience," "character," and "integrity." Only if the agency's examination of these characteristics "indicates" that the applicant's employment would be in the "best interests" of the bank depositors and the public may it refrain from issuing a notice of disapproval. The statute does not define what it means by "competence," "character," or "integrity," but leaves these general terms to be construed by the agency. Nor does the provision explain what is intended to be encompassed by the "best interests" of the depositors and the public, allowing this determination to be made by the agency in its discretion. Additionally, the statute does not require that the adverse evidence regarding an applicant's competence, experience, character, or integrity *demonstrate* that it would be in the best interests of the depositors or the public if the applicant were disapproved, but merely that the evidence "indicate" that to be the case.

We conclude that each of these statutory phrases "exudes deference" to the banking agencies, *see Webster v. Doe,* 486 U.S. at 600, 108 S.Ct. at 2052, and, taken together, preclude the construction of a standard of sufficient definition to support judicial review. Because the statutory language is silent as to how much "competence" or "experience" is necessary to protect the interests of the depositors of a troubled bank or of the public, and provides no definitions for competence or experience, a court would be unable to review the OCC's determination without simply substituting its own judgment for the expert opinion of the agency. Congress, by failing to provide meaningful standards for defining the limits of the agency's discretion, has simply not "indicated an intent to circumscribe agency enforcement discretion." *See Heckler,* 470 U.S. at 834–35, 105 S.Ct. at 1657–58.

The Tenth Circuit has so held in *Community Action of Laramie County, Inc. v. Bowen,* 866 F.2d 347, 353 (10th Cir.1989). There, Community Action of Laramie County, Inc. ("CALC"), a nonprofit organization and grantee agency of the federal Head Start program, sought review of an administrative decision upholding the termination of its Head Start grant. In concluding that the district court lacked subject matter jurisdiction over CALC's claim, the Tenth Circuit applied the exception to judicial review of agency action specified in section 701(a)(2). The court stated:

> Because neither Congress nor HHS [the Department of Health and Human Services] ... has promulgated substantive guidelines for the agency to follow when deciding whether to terminate a grant or impose a lesser sanction for violation of the rules, there is no law for the court to apply. *See Chaney,* 470 U.S. at 832–33, 105 S.Ct. at 1656. The applicable statutes and regulations are so broadly drawn that the court has no standard against which to measure HHS' exercise of discretion. *See Slyper v. Attorney General,* 827 F.2d 821, 824 (D.C.Cir.1987), *cert. denied,* 485 U.S. 941, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988).

*Id.* at 353. The court concluded:

> Without manageable substantive standards against which to judge HHS' exercise of discretion, our review would amount to nothing more than an impermissible ad hoc assessment of the fairness of agency action. We are not empowered to ask whether HHS' decision was wise in the absence of controlling guidelines. "The federal courts ... were not established to operate the administrative agencies of government." *Kuhl v. Hampton,* 451 F.2d 340, 342 (8th Cir.1971).

*Id.* at 354.

Moreover, the Tenth Circuit has recognized the principle that although a particular decision may be susceptible to judicial resolution, that fact does not resolve the question whether the relevant statute provides manageable standards for review. *See American Bank, N.A. v. Clarke,* 933 F.2d 899, 902 (10th Cir.1991) ("agency action does not automatically become reviewable just because the agency gives a ' "reviewable" reason for otherwise unreviewable action.' ") (citing *ICC v. Brotherhood of Locomotive Engineers,* 482 U.S. 270, 283, 107 S.Ct. 2360, 2368, 96 L.Ed.2d 222 (1987)). For example, a prosecutor's decision not to prosecute is not subject to judicial review even though "a common reason for failure to prosecute an al-

leged criminal violation is the prosecutor's belief that the law will not sustain a conviction"—an "eminently 'reviewable' proposition." *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. at 283, 107 S.Ct. at 2368.

The OCC next argues that even if 12 U.S.C. § 1831i(e) provided manageable standards for review of bank management disapproval decisions, "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved" show that Congress did not intend for the courts to second-guess the banking agencies' decisions. It emphasizes that the highly discretionary language of the statute supports the conclusion that Congress meant to preclude review of bank management disapproval decisions. In addition, the OCC points to the fact that the statute requires the agency's evaluation to be made swiftly; unless extended by agreement, the statute contemplates that disapproval determinations will be made within thirty days. 12 U.S.C. § 1831i(b).

Congress passed FIRREA in response to the recent financial crisis affecting the nation's savings and loan industry. As Congress found, that crisis resulted in part from "[p]oor thrift management decisions," which had led to the failure of "hundreds" of government-insured institutions. H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 299 (1989). In order to bolster existing regulatory controls over the quality of financial institution management—and thereby reduce the likelihood that a similar crisis might recur among thrifts (or other depository institutions), Congress passed section 914 of FIRREA, codified at 12 U.S.C. § 1831i.

We are persuaded, in view of the legislative history, that it would be inconsistent with the structure and objectives of the statutory scheme for us to hold that a disapproval decision of the OCC is subject to review by the federal courts.[2]

Finally, the OCC argues that the "nature of the agency action" is inconsistent with judicial review. We find the Tenth Circuit's decision in *American Bank, N.A. v. Clarke*, 933 F.2d 899 (10th Cir.1991), particularly instructive on this point. There, the court held that the Comptroller of the Currency's decisions to close a bank as insolvent and to appoint a receiver were unreviewable. The court, although recognizing that there were standards under the Comptroller's own regulations to judge when an entity was insolvent, observed that such a determination may require an analysis of essentially all of the assets and liabilities of the bank—requiring courts to go through the time-consuming process of reviewing all factual decisions made by the Comptroller. *Id.* at 903. When a bank is insolvent, however, the Comptroller must act quickly to minimize current losses and prevent future losses caused by reactionary run-on-the-bank customer withdrawals. *Id.*

The court noted that by enacting the statute at issue (12 U.S.C. § 191), Congress sought to achieve these goals by authorizing the Comptroller to close an insolvent bank quickly and take expeditious steps necessary to reopen and resume customer service and minimize further loss. It reasoned that "[j]udicial intervention to prevent or postpone closure would reduce the Comptroller's ability to respond to the complex and rapidly

---

**2.** In his reply brief, Hammond asserts that because there exists a presumption in favor of review of agency action, the OCC must show by "clear and convincing evidence" that the disapproval of directors and senior executive officers under 12 U.S.C. § 1831i is committed to the agency's discretion, *citing Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). Hammond claims the OCC has not met this burden. In *Block v. Community Nutrition Inst.*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), the Supreme Court clarified what is required by this standard. It held that, in the context of analyzing a statute to determine whether the statute precludes judicial review, the "clear and

convincing evidence" standard does not require the court to find unambiguous proof, as in the traditional evidentiary sense, of a congressional intent to preclude judicial review. Rather, the standard is met, and the presumption favoring judicial review is overcome, whenever the congressional intent to preclude judicial review is "fairly discernible in the statutory scheme." *Id.* at 350, 104 S.Ct. at 2456, *citing Data Processing Serv. v. Camp*, 397 U.S. 150, 157, 90 S.Ct. 827, 832, 25 L.Ed.2d 184 (1970). We conclude the OCC has met its burden, in light of our determination that congressional intent to preclude judicial review is "fairly discernible in the statutory scheme."

changing circumstances of banking activity."
*Id.*

Similarly, in the case at bar, permitting the courts to review the agency's decision also threatens to throw the management of banks into disarray while the issue of an applicant's qualifications are litigated. As the OCC observes, the possibility for judicial review plainly might encourage banks to await the outcome of litigation over the qualifications of a disappointed applicant, even if it were in the best interests of the institution and the public to put senior management in place more quickly. Clearly, the foregoing scenario is one that Congress, in enacting this legislation, would have wanted to avoid.

In sum, we conclude that review of the OCC's decision to disapprove Hammond's application is precluded by 5 U.S.C. § 701(a)(2). Not only does 12 U.S.C. § 1831i(e) fail to supply judicially manageable standards for reviewing bank management disapproval decisions, but Congress' intent to preclude such review "is fairly discernible in the statutory scheme." *Block v. Community Nutrition Inst.*, 467 U.S. at 351, 104 S.Ct. at 2457 (citation omitted).

### B. Review of the OCC's Decision

Even if we were to hold that the OCC's decision was judicially reviewable, we find that the agency's disapproval of Hammond's employment at First National should be upheld.

#### Standard of Review

■ Agency action may be held unlawful and set aside by a reviewing court if that action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard of review is "narrow" and the agency's discretion is "broad." *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1524 (10th Cir.1992). In order to defend its decision, "[a]ll the agency need do is demonstrate it considered relevant factors and alternatives after a full ventilation of the issues, and that the choice it made was reasonable based on those considerations." *Thomas Brooks Chtd. v. Burnett*, 920 F.2d 634, 643 (10th Cir.1990).

■ Where an agency's decision is based on a factual judgment, it is enough if that judgment is based on "substantial evidence," *Center for Auto Safety v. Federal Highway Admin.*, 956 F.2d 309, 313 (D.C.Cir.1992). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might deem adequate to support a conclusion." *See Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir.1987); *Brown v. Bowen*, 801 F.2d 361, 362 (10th Cir.1986).

In applying this standard, the reviewing court may not "weigh the evidence" or "substitute [its] judgment for that of the agency." *Jordan*, 835 F.2d at 1316. Moreover, where agency decisions are based on credibility determinations, these decisions are not reviewable at all, "unless they are contradicted by 'uncontrovertible documentary evidence or physical facts.'" *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 593 (10th Cir.1979).

#### Whether the OCC's Actions were Arbitrary and Capricious Because the Agency Failed to Make a Finding of Fact Regarding the Anti-competitive Nature of the Alleged Tying Transaction

■ Hammond initially argues that the OCC failed to make any finding of fact regarding the anti-competitive nature of the alleged tying transaction. He contends that a finding of anti-competitive behavior is required by law to sustain a violation of the anti-tying act, *citing Palermo v. First Nat. Bank and Trust Co.*, 894 F.2d 363, 368 (10th Cir.1990). Essentially, Hammond argues that the OCC should have made a specific finding that his act of conditioning the financing of Mid–America on the purchase of the Parker Street property was anti-competitive. Because the OCC failed to make such a finding, he asserts, the OCC's conclusion that Hammond violated 12 U.S.C. § 1972 is contrary to law, and Deputy Comptroller Power's decision upholding the agency's action is arbitrary and capricious.

■ 12 U.S.C. § 1972(1)(A) imposes a *per se* prohibition of extensions of credit conditioned on the purchase of property from the bank. *See Sharkey v. Security Bank &*

*Trust,* 651 F.Supp. 1231 (D.Minn.1987). To state a claim for relief under 12 U.S.C. § 1972, a claimant need only show that a bank (1) extended credit (2) on the condition or requirement (3) that the customer obtain some additional property, other than a loan, discount, deposit, or trust service, from the bank. *Id.* at 1232; *see also Tri–Crown, Inc. v. Amer. Fed. Savings & Loan Ass'n.,* 908 F.2d 578 (10th Cir.1990); *Gage v. First Fed. Savings & Loan Ass'n.,* 717 F.Supp. 745 (D.Kan.1989). 12 U.S.C. § 1972 does not require proof of "actual anticompetitive effects of the challenged practice, such as a bank's dominance or control over the tying product market or that a substantial volume of commerce is affected." *Palermo,* 894 F.2d at 368.

Hammond relies on *Palermo* for the proposition that the Tenth Circuit "has specifically required a finding of anti-competitiveness to sustain a violation of the anti-tying act." In *Palermo,* the court stated that although a plaintiff is not required to prove anti-competitive effects of the challenged banking practice,

> plaintiffs must *show* that the practice complained of is anticompetitive, that the practice results in unfair competition or could lessen competition, and that the practice benefits the bank in some way other than merely allowing the bank additional asset protection.

*Id.* (emphasis added). The opinion does not specifically explain the term "show," but seems to indicate that presenting evidence of anti-tying conduct is sufficient. Nowhere in the opinion does the court articulate that a proper "showing" would require a formal statement announcing a finding of anti-competitive conduct such as "the bank engaged in anti-tying practices."

*Palermo* involved review of a district court's order granting summary judgment in favor of the defendant bank. The Tenth Circuit affirmed, and held that the lending arrangement at issue did not violate section 1972 because the plaintiffs failed to establish an anti-competitive practice. In reaching this conclusion, the court looked to the specific facts in support of the plaintiffs' allegations of anti-competitive practices, and concluded that the plaintiffs failed to come forward with sufficient facts to show an anticompetitive practice.

Here, the OCC in its disapproval decision determined that Hammond conditioned Sander's financing for Mid–America on Sander's purchase of the Parker Street property. We find that this evidence (conditioning a loan on the purchase of an unrelated piece of property upon which the bank has a mortgage) is sufficient to constitute a finding that the practice is anti-competitive. The disapproval decision also reflects the fact Sander realized he was paying more for the Parker Street property than it was worth, and that the bank needed the Parker property "taken care of" because it was in foreclosure on a previous loan. This evidence sufficiently "showed" that the bank's lending arrangement with Sander "benefits the bank in some way other than allowing the bank additional asset protection." *Id.* Country Hill benefited from having the debt it held on the Parker property paid off and assumed by Sander and Shamrock Vending, thereby enabling the bank to convert an asset of extremely doubtful quality (its second mortgage on the bankrupt property) into one (a loan to Sander and Shamrock Vending) of demonstrably greater strength.

Independent of the foregoing, the court finds it notable that the OCC was not bringing an enforcement action under section 1972; it was passing on Hammond's application to head a troubled bank under FIRREA section 914. Therefore, we find that regardless of what a finding of "competitive practice" entails, it was sufficient, for purposes of section 914, for the OCC to conclude that Hammond's actions reflected adversely on his integrity to head a troubled bank.

*Whether the Deputy Comptroller Failed to Follow the Standard of Review Set Forth in 12 C.F.R. § 5.51(f) in Denying Hammond's Appeal and Sustaining the Notice of Disapproval.*

██ Hammond contends that Deputy Comptroller Powers demonstrated "confusion as to the appropriate standard for review of petitioner Hammond's appeal[.]" Powers issued his decision upholding the

OCC's disapproval decision on June 16, 1993. Upon learning of Powers' decision, Hammond wrote Powers a letter, dated June 18, 1993, expressing his dissatisfaction with Powers' decision to uphold the OCC's disapproval decision. By letter dated July 14, 1993, Powers responded to Hammond's letter, stating:

> On the basis of the objective facts set forth in the last paragraph of my letter resolving your appeal, I determined that, despite your denials, it was more likely than not that you had in fact committed that act on which your disapproval was based.

Hammond now seizes upon Powers' use of the phrase "more likely than not," and claims it indicates that the OCC failed to follow the standard of review prescribed by 12 C.F.R. § 5.51(f) in deciding his administrative appeal.

Hammond's argument is without merit. 12 C.F.R. § 5.51(f)(3) provides:

> The Comptroller, authorized delegate, or the appellate official shall independently determine whether the appellant has demonstrated either that the reasons given for the disapproval are contrary to fact or are insufficient to justify the disapproval. If either burden is satisfied, the Comptroller, authorized delegate, or the appellate official shall overturn the disapproval.

Powers applied the standard of review enunciated in 12 C.F.R. § 5.51(f)(3) in determining whether the OCC's decision to disapprove Hammond was proper. In his letter decision of June 16, 1993, addressing Hammond's appeal, Powers states, in part:

> The OCC has reviewed the record in this case, including the grounds given for the Disapproval, your appeal, the documentation submitted with your appeal, and other information relevant to the proposed employment. In accordance with the grounds of your appeal, *the OCC has considered whether the reasons given for disapproval are contrary to fact, that such reasons are insufficient to justify disapproval, or both.* Upon review of all the information, the OCC denies your appeal and sustains the Disapproval. *I find that you have not carried the burden of demonstrating to the OCC that the reasons given for the disapproval are contrary to fact or that such*

*reasons are insufficient to justify the disapproval.*

(Emphasis added.) Powers' letter then goes on to detail specifically the facts leading to his decision. Thus, it is clear that Powers applied the proper standard of review in upholding the OCC decision.

*Whether the OCC's Determination That Hammond Agreed to Finance the Mid–America Acquisition on the Condition that Sander Buy the Parker Street Property is Supported by Substantial Evidence in the Record*

■ Hammond does not dispute that engaging in a violation of the anti-tying provisions of 12 U.S.C. § 1972 reflects adversely on the integrity of a candidate to head a troubled bank, thereby justifying disapproval of an application under section 914. Instead, he denies that he participated in any tying transaction at all. Hammond contends that the OCC's disapproval decision is contrary to fact, and that Powers' decision upholding the agency action is arbitrary and capricious.

The court has carefully reviewed the record in this case, as well as the arguments advanced by Hammond for overturning the agency decision. Ever mindful of the standard of review of agency action by which we are bound, we conclude substantial evidence exists in the record to support the OCC's decision. The submissions to the court reflect that the OCC determined that Hammond had conditioned the financing of the Mid–America property on the purchase of the Parker Street property only after considering all the evidence in the case, including the documentation supplied by Hammond in support of his position.

The following evidence directly supports the fact that a tying transaction occurred: Sander's sworn testimony to the FDIC, wherein he flatly stated that Hammond conditioned the financing of the Mid–American acquisition on the purchase by Sander and his vending company of the Parker Street property; the fact that the purchase price exceeded the value of the Parker Street

property[3] despite the fact that Sander purchased the property "off the courthouse steps," a circumstance that should have led to a bargain price; the fact that the parties originally contemplated that the Parker Street property would be purchased well before the Mid–America loan closing; the circumstances surrounding Country Hill's treatment of Sander, including the fact Country Hill ultimately agreed to sell the Parker Street property to another buyer and credit Sander with $500,000, a figure considered much higher than the property was worth at the time of settlement, and the bank's earlier insistence on obtaining a general waiver of liability from Sander at the time it permitted Sander to release his pledge of an $80,000 certificate of deposit as collateral. All of these factors were considered by the OCC and relied upon to support its conclusion that an illegal tying transaction had occurred.

We conclude that the OCC has fully met its burden to demonstrate that it considered relevant factors after a "full ventilation of the issues," and that the choice it made was reasonable, based on those considerations. *See Thomas Brooks Chtd. v. Burnett,* 920 F.2d 634, 643 (10th Cir.1990). In sum, we find there was substantial evidence in the record to support Powers' conclusion that the OCC's disapproval decision was not contrary to fact and that the reasons given were sufficient to justify disapproval. Accordingly, Powers' decision upholding the agency action was not arbitrary, capricious, an abuse of discretion, or contrary to law.

IT IS THEREFORE ORDERED that this court lacks jurisdiction to review the OCC's disapproval decision. In the alternative, in reviewing the merits of the appeal, the OCC's disapproval decision is affirmed.

---

3. Evidence in the record indicates that the people with whom Sander spoke regarding the Parker Street property thought the $600,000 price paid was "very high"; furthermore, the purchase price exceeded the $563,000 appraised value, even though the appraisal was based on highly optimistic assumptions (i.e., that the property would have only a 10 percent vacancy rate in two years and its operating costs would be the lowest available.)